**Supreme Court**

No. 2012-105-C.A.

(P1/11-651A)

State                    :

v.                    :

Steven B. Morris.                    :

NOTICE:    This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                 :

v.                  :

Steven B. Morris.        :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

# O P I N I O N

**Justice Indeglia, for the Court.**  The state appeals from an order of the Superior Court granting the defendant's motions to suppress and/or exclude evidence obtained by Pawtucket police detectives following the defendant's arrest in the city of Providence.  The defendant Steven B. Morris (Morris or defendant) was indicted for two separate incidents of first-degree robbery committed in Pawtucket in violation of G.L. 1956 § 11-39-1(a).  On appeal, the state argues that the hearing justice erred in deciding that evidence stemming from an extra-jurisdictional arrest was subject to the exclusionary rule of the Fourth Amendment to the United States Constitution.  For the reasons set forth in this opinion, we vacate the order of the Superior Court.

## I

## Facts and Travel

The facts in this matter are largely undisputed.  The first of the two robberies with which defendant was charged occurred on September 6, 2010 when Alcides Dias, an assistant manager

at PCX Clothing Store in Pawtucket, was robbed at knifepoint.[1]  Detective David Silva of the Pawtucket Police Department testified that Dias described the robber as being a "black male in his forties, or late thirties, * * * heavyset, stocky," and wearing a red hat, white shirt, black and blue shorts, and black gloves with the tips cut off.  A few days later, on September 9, 2010, the Save-a-Lot grocery store in Pawtucket was also robbed at knifepoint.  Nicole Cookson, the victim in that robbery, described the robber as being "a black male, forties, stocky build, Hawaiian shirt, yellow hat, running shorts[.]"  Two other witnesses said that the robber fled the store in a black Mercedes Benz with a temporary license plate in the rear window of the car.  The witnesses also said that the license plate contained the numbers 1367 or 1376.  Detectives Silva and Donti Rosciti of the Pawtucket Police Department reviewed the surveillance footage from both robberies and, based on the videos, formed a belief that the person who had robbed the PCX had also committed the Save-a-Lot robbery.  They then sent an email to all other police officers in the department with the description of the getaway vehicle.

The following day, Officer Mark Ramos identified a car matching that description parked outside of 327 Sayles Avenue in Pawtucket.  Officer Ramos notified the detectives and discovered, on speaking to one of the residents, that the car belonged to "a black male * * * who lived on the third floor."  Detective Silva used the vehicle identification number of the car and was informed by the dealer at Class Act Auto Sales that the car had been sold to Morris.  Officer Ramos and the detectives then went to the third floor of the building and received the consent of the resident to search the apartment.  The resident of the apartment confirmed that Morris sometimes stayed overnight as a guest and directed the police to a storage room in the apartment

---

[1] The facts in this section are taken from the testimony of the detectives and other witnesses who testified at the hearing.

where defendant kept some of his belongings. The police seized clothing and an Allstate insurance policy in defendant's name for the Mercedes.

Detective Silva obtained defendant's phone number and called him, explaining that his vehicle had been seen leaving the scene of a robbery. The defendant identified the vehicle by asking, "My Mercedes?" Detective Silva told defendant that the detectives needed to speak with him. Although defendant offered to take a bus to the Pawtucket police station, he was eventually convinced by Det. Silva that he be picked up at Crossroads[2] in Providence.

On arriving at Crossroads, the detectives saw defendant and recognized him as the person whom they had observed in the surveillance footage from both robberies. After a brief conversation with defendant in which he agreed to accompany the detectives to the police station, Det. Rosciti performed a pat-down search of him. Detective Rosciti testified that the pat-down looking for weapons was standard procedure before any civilian is permitted to enter a police vehicle. On performing the pat-down, Det. Rosciti felt something like paper or plastic in one of defendant's pockets and removed it. The piece of paper that Det. Rosciti took from defendant's pocket was later identified as being a U-Haul rental truck receipt. Detective Rosciti testified that he took it out because he believed it might be contraband, such as a small packet of heroin or marijuana.

Morris was taken to the Pawtucket police station in the detectives' car. Morris was not handcuffed while in the car. After arriving at the Pawtucket police station, defendant reviewed and initialed a Miranda rights waiver form. The detectives asked defendant where he had been the previous day, September 9, 2010, and defendant answered that he had been helping his sister move from 8 a.m. to 6 p.m. and had rented a U-Haul truck for that purpose. It was at that point

---

[2] Crossroads is a facility, located on Broad Street in Providence, that offers shelter and other life services for the homeless.

that the detectives looked at the U-Haul receipt that had been seized from defendant's person during the pat-down search. Detective Rosciti also spoke to Vivian Morris, defendant's sister, who told him that defendant had called suddenly on September 9, between 1 and 1:30 p.m., and told her that he was going to move her that day. Following the conversation with Vivian Morris, the detectives then went to the U-Haul franchise in Pawtucket and reviewed the surveillance footage there. This footage showed defendant wearing what appeared to be the same clothing that the suspect in the Save-a-Lot robbery had been wearing.

The defendant was charged with two counts of first-degree robbery for the two armed robberies. The defendant filed a number of pretrial motions, including a motion to sever the charges pursuant to Rule 14 of the Superior Court Rules of Criminal Procedure, as well as several motions to suppress (1) certain clothing and paperwork found in the apartment on Sayles Avenue in Pawtucket, (2) the U-Haul receipt seized from defendant's person, (3) photographs taken from the surveillance video from the U-Haul franchise in Pawtucket, (4) the statements defendant made to the Pawtucket police, and (5) the testimony of defendant's sister, Vivian Morris.

The pretrial motions were heard in the Providence County Superior Court on February 23, 24, and 27, 2012. The hearing justice granted defendant's motion to sever the charges, and the state elected to proceed first on the charge involving the Save-a-Lot robbery.[3] After hearing testimony and argument, the hearing justice granted defendant's motion to suppress the U-Haul receipt, concluding that defendant was under arrest from the moment of the pat-down procedure and that "the arrest was illegal because it was outside [the] jurisdiction [of the detectives]." The hearing justice also granted defendant's motions to suppress defendant's statement to the

---

[3] The motion to sever is not an issue before this Court.

- 4 -

Pawtucket police, the testimony of defendant's sister, and the U-Haul surveillance video photographs as "fruits of the poisonous tree" stemming from defendant's unauthorized arrest.[4] The hearing justice denied defendant's motion to suppress the clothing and paperwork seized from the apartment on Sayles Avenue.[5]

The state timely filed a notice to appeal the hearing justice's granting of defendant's various motions to suppress evidence, pursuant to G.L. 1956 § 9-24-32.[6] A final order memorializing the hearing justice's decisions on defendant's motions to dismiss was entered on May 14, 2012.[7]

Additional facts will be supplied as necessary to address the issues on appeal.

## II

## Standard of Review

In reviewing the grant or denial of a motion to suppress, this Court accords deference to the trial justice's factual findings and accepts those findings unless they are clearly erroneous. See State v. Musterd, 56 A.3d 931, 936 (R.I. 2012). We engage in a de novo review of any questions of law and of mixed questions of law and fact involving constitutional issues. State v.

---

[4] The "fruit of the poisonous tree" doctrine dictates that evidence obtained directly or indirectly through illegal actions by the police should be barred from admission at trial. See Wong Sun v. United States, 371 U.S. 471, 484-88 (1963).

[5] The defendant also filed a motion to suppress a photograph taken of him at the Pawtucket police station during processing. The hearing justice denied that motion. Accordingly, that issue is also not before this Court on appeal.

[6] General Laws 1956 § 9-24-32 states, in pertinent part, "[i]n any criminal proceeding, the attorney general shall have the right to object to any finding, ruling, decision, order, or judgment of the superior court or family court, and the attorney general may appeal the findings, rulings, decisions, orders, or judgments to the supreme court at any time before the defendant has been placed in jeopardy * * *."

[7] This Court deems an appeal filed before the entry of a final judgment or order to be timely. See Chapdelaine v. State, 32 A.3d 937, 941 n.1 (R.I. 2011).

<u>Barkmeyer</u>, 949 A.2d 984, 995 (R.I. 2008). In addition, "we review questions of statutory interpretation <u>de</u> <u>novo</u>." <u>Campbell v. State</u>, 56 A.3d 448, 454 (R.I. 2012).

## III

## Discussion

On appeal, the state contends that even though defendant's arrest was made outside the Pawtucket police officers' jurisdictional authority,[8] the hearing justice erred in applying the Fourth Amendment[9] exclusionary rule to suppress the evidence obtained from the arrest. The state bases its argument on the United States Supreme Court opinion in <u>Virginia v. Moore</u>, 553 U.S. 164, 178 (2008), in which the Supreme Court held that the Fourth Amendment "does not require the exclusion of evidence obtained from a constitutionally permissible arrest." The state contends that the police officers' actions were reasonable and that consequently, the exclusionary rule is too extreme a remedy under the facts of this case. In contrast, defendant argues that application of the exclusionary rule is the appropriate remedy for a violation of state law and that the circumstances of the instant case did not otherwise justify the detectives' failure to respect the jurisdictional boundaries of their authority.

## A

## The Authority of the Pawtucket Police Officers

This Court has repeatedly held to the principle that "[i]n the absence of a statutory or judicially recognized exception, the authority of a local police department is limited to its own jurisdiction." <u>State v. Ceraso</u>, 812 A.2d 829, 833 (R.I. 2002) (citing <u>Page v. Staples</u>, 13 R.I. 306

---

[8] The state concedes for the purposes of this appeal that defendant was placed under arrest from the moment of the pat-down search. Accordingly, the question of whether defendant was actually under arrest before he was taken to the Pawtucket police station is not before this Court.
[9] The Fourth Amendment to the United States Constitution states, in pertinent part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated * * *."

(1881)).[10] The General Assembly has established two exceptions to this rule. The first, known as the "hot pursuit" exception, permits police officers who are in "close pursuit" of a person to cross into another jurisdiction in order to arrest that person. See G.L. 1956 § 12-7-19.[11] "Second, in emergency situations, it may be necessary and appropriate for the police from one jurisdiction to exercise authority in another jurisdiction." Ceraso, 812 A.2d at 833; see also G.L. 1956 § 45-42-1 (granting officers responding to a request for "emergency police assistance from another police department * * * the same authority, powers, duties, privileges, and immunities as a duly appointed police officer of the city or town making the request"). This Court has further recognized that "the jurisdictional borders confining the authority of the state's various police departments * * * have become blurred by time and necessity." State ex rel. Town of Portsmouth v. Hagan, 819 A.2d 1256, 1259 (R.I. 2003).

The hearing justice concluded that defendant's arrest was based on probable cause and therefore justified even though the police officers did not have a warrant for defendant's arrest at the time.[12] The hearing justice went on to consider both exceptions to the jurisdictional

---

[10] We recognize that Page v. Staples, 13 R.I. 306 (1881), was decided under a county system of government whose role has been greatly reduced in Rhode Island and, to that extent, is now of questionable viability.

[11] General Laws 1956 § 12-7-19 states,

> "Any member of a duly organized municipal peace unit of another city or town of the state who enters any city or town in close pursuit and continues within any city or town in such close pursuit of a person in order to arrest him or her on the ground that he or she has violated the motor vehicle code in the other city or town shall have the same authority to arrest and hold in custody the person as members of a duly organized municipal peace unit of any city or town have to arrest and hold in custody a person on the ground that he or she has violated the motor vehicle code in any city or town."

[12] Section 12-7-4 permits police officers to make a warrantless arrest if they have "reasonable ground to believe that a felony has been * * * committed and that the person to be arrested has committed * * * it."

limitation on police officers' authority and determined that neither exception applied. Consequently, he concluded that the arrest, although based on probable cause, was unauthorized as a violation of the detectives' jurisdictional authority.

We agree with the hearing justice's conclusion that neither of the statutory exceptions applies to the case at bar. Detectives Rosciti and Silva were not in hot pursuit of defendant nor were they in Providence at the Providence Police Department's request.

The defendant contends that the detectives had probable cause to arrest him before they arrived at Crossroads and that the detectives had, consequently, traveled to Providence with the specific intention of doing so. We disagree with defendant's contention. We have held that "[p]robable cause to arrest exists when the facts and circumstances within the police officer's knowledge and of which he has reasonably trustworthy information are sufficient to warrant a reasonable person's belief that a crime has been committed and that the person to be arrested has committed the crime." Musterd, 56 A.3d at 936 (quoting State v. Kryla, 742 A.2d 1178, 1182 (R.I. 1999)). We are of the opinion that probable cause for defendant's arrest did not arise until the detectives arrived at Crossroads and visually identified him as the person they had seen in the surveillance videos of the robberies. Until the detectives matched defendant with the perpetrator of the robberies in the videos, they knew only that defendant was the owner of a car that appeared to match the one used at the Save-a-Lot robbery. Accordingly, we cannot agree with defendant's contention that the detectives crossed the boundary into Providence with the intent to arrest him. We give credence to Det. Silva's testimony at the hearing that, at the time, they intended only to transport defendant to the Pawtucket police station to question him about the involvement of defendant's Mercedes in the robberies.

The defendant further argues that the Pawtucket detectives should have called the Providence police before they entered Providence. We disagree with defendant's argument and find our recent opinion in Hagan to be informative. In Hagan, Portsmouth police, having lawfully arrested the defendant in their jurisdiction, drove him to Middletown in order to conduct a Breathalyzer test after discovering that the machine in Portsmouth was malfunctioning. See Hagan, 819 A.2d at 1257. There, we distinguished between the "arrest and seizure of a suspect outside a municipality's borders * * * and the extraterritorial transport of a prisoner who is in lawful custody, for the performance of legitimate law enforcement duties * * *." Id. at 1261. We "acknowledge[d] the practical realities of police investigations into unlawful conduct" in holding that "[a] police officer may take a prisoner already in lawful custody to another municipality to carry out legitimate law enforcement duties." Id. Similarly, in the case at bar, we are satisfied that the Pawtucket police could properly travel outside of their jurisdiction without the accompaniment of Providence police in the course of investigating the robberies. We find no fault with the Pawtucket detectives' behavior until they arrived at Crossroads.

We acknowledge that once the Pawtucket detectives arrived at Crossroads and made their visual identification of defendant as the perpetrator of the robberies, their actions did not follow the mandates for proper law enforcement activities outside of their jurisdiction. The state argues that, upon identifying defendant, the detectives were then justified in immediately arresting him to prevent defendant from "abscond[ing], perhaps to commit a third violent crime before recapture[.]" We do not agree with the state's argument. Indeed, we find it implausible based on the facts of the case at bar. The defendant's meeting the detectives at Crossroads and his cooperation with the detectives when they arrived do not indicate to this Court that defendant was a threat to flee from the police. We note that, if defendant had been inclined to flee, he

would hardly have been waiting at Crossroads to be questioned by the detectives at all. While the detectives may well not have expected defendant to appear, we deem it unreasonable to believe that he presented a risk of flight, once they saw that defendant had, in fact, met them at Crossroads.[13] Accordingly, we are satisfied that, from the moment the detectives arrived at Crossroads and determined they had probable cause to make an arrest, our jurisprudence required that they contact the Providence police department to ask for its assistance in arresting defendant. It was undisputed that Crossroads is located close to the Providence police station. Under the circumstances, we do not believe that requiring the Pawtucket detectives to contact the Providence police in order to make the arrest would have placed an unreasonable burden on them.

We emphasize that there is nothing in the record to indicate that contacting the Providence police and then waiting for their assistance would have required unlawfully detaining defendant for any length of time but rather could have been done in a matter of minutes. "[W]e are cognizant of the strong public interest underlying jurisdictional restraints over law enforcement personnel and are mindful that the Legislature has granted limited authority to an officer to arrest a suspect outside his or her jurisdiction * * *." Hagan, 819 A.2d at 1261. Under the circumstances presented here, we decline to expand the authority which the Legislature has granted to a police officer to arrest a suspect outside of his or her jurisdiction. Consequently, we hold that the Pawtucket detectives' actions in arresting defendant outside their jurisdiction without even attempting to get the assistance and approval of the Providence police were unauthorized and in excess of their authority.

---

[13] We find a belief that defendant posed a risk of flight to be especially unreasonable under the circumstances as defendant was, to the best of the detectives' knowledge, without the use of a car. We note that defendant had previously offered to take the bus to the Pawtucket police station.

# B

## The Appropriate Remedy for Defendant's Unauthorized Arrest

Our analysis, however, must continue on to determine whether the Fourth Amendment to the United States Constitution mandates the exclusion of evidence obtained from defendant's extra-jurisdictional arrest. The state argues that application of "the exclusionary rule is too harsh a remedy for any violation of a state jurisdictional statute" where, as here, the police officers "act[ed] in good-faith furtherance of their duty to protect the public[.]"

It is axiomatic that "[t]he exclusionary rule bars from introduction at trial evidence obtained either during or as a direct result of searches and seizures in violation of an individual's Fourth Amendment rights." State v. Jennings, 461 A.2d 361, 368 (R.I. 1983). This prohibition against the use of evidence obtained after an illegal search applies with equal force against the use of evidence obtained from an unlawful arrest. See Wong Sun v. United States, 371 U.S. 471, 485 (1963). The exclusionary rule operates as "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." United States v. Calandra, 414 U.S. 338, 348 (1974). "[W]hether the exclusionary rule's remedy is appropriate in a particular context * * * [is] an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct." Illinois v. Gates, 462 U.S. 213, 223 (1983). The United States Supreme Court has warned that "unbending application of the exclusionary sanction to enforce ideals of governmental rectitude would impede unacceptably the truth-finding functions of judge and jury." United States v. Payner, 447 U.S. 727, 734 (1980). It is with these general principles in mind that we will consider whether the evidence obtained as a result of defendant's unauthorized arrest must be suppressed.

The United States Supreme Court has recently addressed the question of whether the Fourth Amendment requires that evidence obtained from a search made incident to an arrest that was unlawful under state law be excluded. See Moore, 553 U.S. at 177-78. Moore involved an arrest for the misdemeanor of driving on a suspended license, which under Virginia law was not an arrestable offense. Id. at 167. The Supreme Court concluded that "the arrest rules that the officers violated were those of state law alone" and "it is not the province of the Fourth Amendment to enforce state law."[14] Id. at 178. Accordingly, the Supreme Court held that the Fourth Amendment did not require the exclusion of the evidence because of a violation of a state law where the arrest was otherwise "constitutionally permissible" under the federal constitution. Id.

More recently, the United States Court of Appeals for the First Circuit has addressed the issue of whether evidence obtained after an arrest made outside of a federal law enforcement officer's jurisdiction is inadmissible for that reason. See United States v. Ryan, 731 F.3d 66, 67 (1st Cir. 2013). In Ryan, a United States Park Ranger saw the defendant driving over the center line of the road and after following the defendant, pulled him over for the traffic violation, at which time the Ranger determined that the defendant was intoxicated.[15] Id. The traffic stop and the defendant's subsequent arrest occurred outside of the National Park System and, therefore, outside of the federal statutory jurisdiction of the Ranger. Id. at 67-68. The First Circuit cited Moore in noting that, generally, federal constitutional claims have not been based on violations

---

[14] The United States Supreme Court specifically noted that "Virginia law does not, as a general matter, require suppression of evidence obtained in violation of state law." Virginia v. Moore, 553 U.S. 164, 167 (2008). The Supreme Court's analysis, therefore, was limited to the question of whether suppression was required under the federal constitution. Id. at 168.

[15] The federal statute limiting the jurisdiction of the Ranger included an exception for when a person flees to avoid arrest. See United States v. Ryan, 731 F.3d 66, 68 n.2 (1st Cir. 2013). In Ryan, however, there was no claim that the defendant was fleeing and so this exception was deemed to be inapplicable. Id.

of state or federal statutes concerning arrest. See id. at 69. The court concluded that "an officer * * * arrest[ing] an obviously intoxicated driver just outside that officer's territorial jurisdiction, after a lawful traffic stop, is 'not remotely' akin to the invasions of privacy that might call for the exclusion of evidence [under the Fourth Amendment]." Id. at 70.

Here, there is no question that defendant's arrest, although extra-jurisdictional, involves only a violation of state law and not of defendant's constitutional rights. As a general matter, "the lawfulness of a state arrest by state police is governed by state law so long as that law is not inconsistent with federal constitutional standards." State v. Berker, 120 R.I. 849, 855, 391 A.2d 107, 111 (1978). This Court has further concluded that a warrantless arrest made under our state statutes is "constitutionally sound * * * to the extent that it meets the requirement of probable cause[.]" Id. at 856, 391 A.2d at 111; cf. Ryan, 731 F.3d at 70 (noting that Moore "implies that an extraterritorial arrest is not a per se violation of the Fourth Amendment"). Our primary concern here is, therefore, with the requirements of the Fourth Amendment exclusionary rule for an arrest, based on probable cause, that was made outside the territorial jurisdiction of the arresting officer. We hold, in conjunction with the United States Supreme Court and the First Circuit, that the Fourth Amendment does not mandate exclusion of evidence obtained after defendant's arrest outside of the Pawtucket detectives' jurisdiction.

Although the arrest here was in excess of the officers' jurisdiction, the Fourth Amendment does not impose some hypothetical ideal of a law enforcement officer's conduct, but rather is concerned with whether the officer's conduct was "reasonable" under the circumstances. See State v. Taveras, 39 A.3d 638, 648 (R.I. 2012) ("The lynchpin of any Fourth Amendment analysis is reasonableness."); see also State v. Johnson, 102 R.I. 344, 351, 352, 353, 230 A.2d 831, 835, 836 (1967) (stating that "standards of reasonableness under the Fourth

- 13 -

Amendment are not susceptible of Procrustean application" and that a court "should measure the totality of circumstances against the constitutional standard of reasonableness" and be mindful of the fact that "a law enforcement officer * * * must act on a quick appraisal of the facts before him without the benefit of the hindsight which is usually possessed by those reviewing his actions"). This Court has stated that the exercise of our supervisory power to interpret and apply the exclusionary rule "should be exercised with great restraint after balancing carefully the societal interests involved." State v. Jackson, 570 A.2d 1115, 1117 (R.I. 1990). We are of the opinion that the detectives' actions in the case at bar do not constitute egregious conduct in excess of their jurisdiction. Accordingly, we conclude that the exclusionary rule of the Fourth Amendment does not apply here to suppress the evidence gathered as a result of defendant's unauthorized arrest.[16]

The defendant urges us to adopt the reasoning of the Supreme Judicial Court of Massachusetts in Commonwealth v. Hernandez, 924 N.E.2d 709 (Mass. 2010). In Hernandez, the Supreme Judicial Court upheld the suppression of evidence obtained after Boston University campus police had arrested the defendant without the statutory authority to do so. See id. at 710-11. The Supreme Judicial Court addressed the holding in Moore, but concluded that past precedents of that court had established that suppression was appropriate because "exclusion is a deterrent to the abuse of official power based on the application of State legal principles." Id. at

---

[16] The defendant asserts that this Court has previously applied the exclusionary rule as a remedy for the violation of state law, citing, in particular, State v. Robinson, 658 A.2d 518 (R.I. 1995) as a case where this Court used the exclusionary rule to suppress a confession obtained after a violation of the District Court Rules of Criminal Procedure. We are convinced, however, that this case is not applicable to the case at bar. Robinson involved an arrest and detention made without probable cause, where the actions of the police were egregious. Robinson, 658 A.2d at 520-21. Indeed, this Court explicitly noted that what was at issue in Robinson was "[t]he violation of * * * constitutional protections," not only a violation of a state procedural rule. Id. at 522.

712. We deem Hernandez to be inapposite to the instant case. To begin with, the Supreme Judicial Court based its conclusion on its own past precedents and Massachusetts statutory law, which differ both from the Fourth Amendment jurisprudence of the United States Supreme Court and from our own jurisprudence. See id. at 712-13; cf. State v. Barros, 24 A.3d 1158, 1167 (R.I. 2011) (declining to follow the reasoning of the Supreme Judicial Court with regard to jury instructions about custodial interrogations). In addition, we note that the conduct of the campus police in Hernandez was significantly more egregious than the conduct of the Pawtucket detectives here. In Hernandez, the campus police apparently decided to run a check of the defendant's automobile when the defendant was engaged in nothing more suspicious than pumping gasoline and then proceeded to arrest the defendant for an outstanding warrant for an offense that had no connection to the university. See Hernandez, 924 N.E.2d at 711. The campus police behavior in Hernandez is not analogous to the conduct of the Pawtucket detectives here. Accordingly, we decline to adopt the reasoning of Hernandez to order the suppression of the evidence the Pawtucket detectives obtained in the instant case.

We recognize that Rhode Island also has a statutory exclusionary rule embodied in G.L. 1956 § 9-19-25.[17] This Court has, however, concluded that § 9-19-25 largely tracks the exclusionary rule of the Fourth Amendment. See State v. Mattatall, 603 A.2d 1098, 1113 (R.I. 1992) ("[T]his [C]ourt has, with very few exceptions, followed the opinions of the United States Supreme Court whether premised on the Fourth Amendment to the United States Constitution or on our own statutory exclusionary rule. The Rhode Island exclusionary rule is a statute that has

---

[17] General Laws 1956 § 9-19-25 states:

> "In the trial of any action in any court of this state, no evidence shall be admissible where the evidence shall have been procured by, through, or in consequence of any illegal search and seizure as prohibited in § 6 of article 1 of the constitution of the state of Rhode Island."

never acquired or developed an independent body of jurisprudence."). Moreover, because we are satisfied that, under <u>Moore</u>, 553 U.S. at 169, and <u>Ryan</u>, 731 F.3d at 69-70, defendant's arrest did not violate the Fourth Amendment, we conclude that it similarly did not violate defendant's rights under article 1, section 6 of the Rhode Island Constitution. <u>See</u> <u>State v. Foster</u>, 842 A.2d 1047, 1050 n.3 (R.I. 2004) (noting that the Fourth Amendment "is substantively the same as article 1, section 6 of the Rhode Island Constitution"); <u>see</u> <u>also</u> <u>Brousseau v. Town of Westerly</u>, 11 F.Supp. 2d 177, 183 (D. R.I. 1998) (recognizing that article 1, section 6 of the Rhode Island constitution is generally co-extensive with the federal Fourth Amendment). Accordingly, we are of the opinion that our statutory exclusionary rule also does not mandate the suppression of the evidence obtained in this case.

In so doing, we emphasize that our holding is limited to the specific facts of the case at bar. We reserve for another day a decision as to whether more egregious violations of state law would trigger application of our statutory exclusionary rule. <u>Cf.</u> <u>Mattatall</u>, 603 A.2d at 1112-13 (declining to expand our statutory exclusionary rule in that case beyond what was required under the Fourth Amendment).

As this Court has stated before, "[w]e believe that an exclusionary rule is strong medicine indeed since it deprives the trier of fact in many instances of highly relevant and reliable evidence." <u>Jackson</u>, 570 A.2d at 1117. We are of the opinion that the detectives' conduct here was not egregious enough to justify exclusion of probative evidence, and we decline to expand our exclusionary rule jurisprudence to require the suppression of evidence in the circumstances of the case at bar. Accordingly, we hold that the hearing justice erred in granting the defendant's motions to suppress the U-Haul receipt, his statement to the Pawtucket police, the testimony of the defendant's sister, and the U-Haul surveillance video photographs.

**IV**

**Conclusion**

For the foregoing reasons, we vacate the order of the Superior Court granting the defendant's motions to suppress the evidence obtained as a result of his arrest. This case is remanded to the Superior Court for further proceedings consistent with this opinion.


**TITLE OF CASE:**       State v. Steven B. Morris.

**CASE NO:**       No. 2012-105-C.A.
                              (P1/11-651A)

**COURT:**       Supreme Court

**DATE OPINION FILED:**  May 28, 2014

**JUSTICES:**       Suttell, C.J., Goldberg, Flaherty**,** Robinson, and Indeglia, JJ.

**WRITTEN BY:**       Associate Justice Gilbert V. Indeglia

**SOURCE OF APPEAL:**    Providence County Superior Court

**JUDGE FROM LOWER COURT**:

             Associate Justice Edward C. Clifton

**ATTORNEYS ON APPEAL:**

             For State:  Lauren S. Zurier
                         Department of Attorney General

             For Defendant:  Kara J. Maguire
                         Office of the Public Defender